UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RIMMA VAKS | I | |
| Plaintiff, | I | |
| | I | |
| v. | I | Civil Action |
| | I | 1:18-cv-12571-LTS |
| TOM QUINLAN, DORIAN LEBLANC and | I | JURY TRIAL DEMAND |
| LUMIRADX | I | |
| Defendants | I | Leave to amend allowed on 05/21/2019 |
| | I | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, Rimma Vaks, and for her Complaint in the above-entitled action, alleges and states as follows:

### PARTIES

1. Plaintiff, Rimma Vaks, is an individual residing at 103 Puritan Lane, Swampscott, Massachusetts.

2. Defendant, LumiraDX, is believed to be a corporation with its principal place of business to be at 221 Crescent Street, Waltham, MA 02453, USA.

3. Defendant, Tom Quinlan, is residing at 3 Kaitbenski Dr, Sturbridge, MA 01566. At all times relevant to this Complaint, Defendant was the LumiraDX's General Manager.

4. Defendant, Dorian LeBlanc, is residing at 30 Blueberry CV, Yarmouth, ME 04096014105. At all times relevant to this Complaint, Defendant was LumiraDX's Head of HR and CFO.

5. Both, Defendant, Tom Quinlan, and Defendant, Dorian LeBlanc, had total authority (1) to hire and fire employees; (2) to promulgate work rules and assignments and set conditions of employment, including compensation, benefits and hours; (3) to implement day-to-day supervision, including discipline; and (4) control of employee records, including payroll. At all times they were "*EMPLOYERS*" within the meaning of Title VII of the 1964 Civil Rights Act and the Civil Rights Act of 1991, the ADEA and the M.G.L. C. 151B and was in charge of hiring and firing.

1

## NATURE OF THE ACTION

6. This is an action against Defendant pursuant to the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621 et seq.); Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-2(a); and M.G.L. c. 151B §§4(1), 4(4) & 4(4A) on the grounds that Ms. Vaks was discriminated against because of her age (sixty-two (62)), gender (female), and in retaliation for complaining to Defendants about harassment and discrimination.

7. This is an action against Defendants for violations of the ADEA and Title II of OWBPA 29 U.S.C. § 621 et seq..

8. This action is against Defendants for denial and interference with Ms. Vaks substantive under the FMLA Act to exercise her rights when they violated FMLA regulations (29 U.S.C. § 2615, § 2617).

9. This complaint arises out of illegal pattern and practices by LumiraDX and its agents of aiding and abetting discrimination and retaliation that followed Ms. Vaks' complaint of the discrimination.

10. This action is against Defendants for failing to maintain Ms. Vaks' personnel records in violation of G.L. Chapter 159 Section 52C.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On April 6, 2018, Ms. Vaks filed a charge of discrimination based on age discrimination, gender discrimination, and retaliation with the U.S. Equal Employment Opportunity Commission; Charge No. 523-2018-01018. Subsequently, on June 26, 2018, the U.S. Equal Employment Opportunity Commission ("EEOC") issued Ms. Vaks this Notice of Right Sue. Ms. Vaks files this lawsuit within ninety (90) days of receiving his Notice of Right to Sue and his lawsuit is, therefore, timely filed.

## FACTS

12. Ms. Vaks worked for Defendants from November 21, 2016 until Defendants terminated her employment on January 4, 2018 as a Principal Development Manager.

13. Ms. Vaks received a degree in Mathematics in the former Soviet Union. She studied all subjects in Russian language which is her first language. The English language has

become her second language. She has over 30 years' experience in Software Development. She has no business education or experience.

14. Ms. Vaks was well qualified for her technical positions and performed well for Defendants. Ms. Vaks had numerous contributions and accomplishments during her employment at Defendants.

15. Before hiring, she was interviewed by eight employees including the CEO, Sumit Nagpal.

16. She was hired as an Agile Transformation specialist to implement Agile Processes across the Health IT division of LumiraDX that would allow it to build and deliver Software applications to the Company's clients. During the interviewing process she was told that the Company was struggling to deliver software products to their clients using the existing processes. Agile Software Development is a lightweight software engineering framework that promotes iterative and incremental software development throughout the life-cycle of the product.

17. After evaluating the state of the processes, Ms. Vaks proposed a road map and a transition plan to the CEO and EVP. They approved her plan, and she conducted a series of Agile Methodology training sessions and coaching with teams and people. She continued coaching and mentoring teams and people throughout her employment with LumiraDX.

18. In about 2.5 months since her hiring, the CEO, Mr. Sumit Nagpal, told Ms. Vaks that he was impressed with the immediate positive results he observed since she joined the Company and asked her to take on additional responsibility of managing the Software Development Department replacing the current Director of Engineering, Adrian Byng-Clarke, who had been leading this department for more than 10 years.

19. Ms. Vaks expressed her concerns that this move would hurt Mr. Byng-Clarke's feelings and he wouldn't be happy with the new reorg, but Mr. Nagpal assured her that he had already spoke to Mr. Byng-Clarke, and "he is on board with this change". As Ms. Vaks discovered later, he had never come "on board" with this decision.

20. Although, Mr. Byng-Clarke was demoted from managing the entire Engineering Team to managing just one small group (Development Operation), and Ms. Vaks assumed his responsibility of managing the three Software Development teams and one Quality Assurance (QA) team, he retained his position of the Director of Engineering while her title was never upgraded nor did she received additional compensation.

21. A couple of weeks later, the LumiraDX's Chief Technology, Director and one of the founders, David Scott, PhD, conducted an extensive in depth interview with Ms. Vaks and consequently approved her candidacy for the promotion.

22. Following the extensive interviewing process, it was concluded that Ms. Vaks was qualified to perform her double duties as Head of Engineering and Agile Transformation Manager. She became responsible for managing Engineering Department and implementation (transformation) of Agile methodology within the Company.

23. On June 14, 2017, Mr. Nagpal announced via email that Tom Quinlan will be replacing him as the head of Health IT Product Development. Prior to this announcement, Mr. Quinlan led the FitLinxx division that LumiraDX acquired in 2016.

24. As a result of this reorganization, Mr. Quinlan became Ms. Vaks' direct supervisor.

25. This reorganization came as a result of Ms. Vaks' whistleblowing of the problems, misrepresentations and deceptive activities by the CEO and people "loyal" to him she had observed since she was hired. Ms. Vaks reported these problems to Mr. Dorian LeBlanc, who was a VP of Finance at that time. His investigation uncovered numerous misconduct and impropriety committed by Mr. Nagpal who ran "the Theranos" type of scam deceiving investors, clients, Board Of Directors and employees. Mr. LeBlanc told Ms. Vaks that her actions saved the Company and its investors and assured her that her job is secure and there *will be no retaliation* against her for coming forward. As a result of the investigation, about 40% of Health IT employees including Mr. Nagpal were either terminated or had resigned.

26. Following the Board's reaction to his scam, Mr. Nagpal orchestrated a sophisticated retaliatory campaign against Ms. Vaks which involved all members of his "loyal team" with the goal to have Ms. Vaks fired.

27. One of the method for retaliating against Ms. Vaks, Mr. Nagpal by members of his team began posting defaming reviews on Glassdoor website specifically targeting Ms. Vaks. Ms. Vaks informed both Mr. Quinlan and Mr. LeBlanc about those postings. They told her that they were aware of them, but decided not to get involved. Consequently, the Glassdoor removed all those postings as they clearly targeted and defamed a specific person in violation of the Glassdoor's policies.

28. The other path of Mr. Nagpal's retaliation was blaming Ms. Vaks for all the problems with the Company. He contrived a message that "people could not work with Ms. Vaks" and

instructed his team to deliver it to Mr. Quinlan. Even people who had never worked with Ms. Vaks carried it to Mr. Quinlan.

29. To Mr. Nagpal's satisfaction, Mr. Quinlan took the bait and began relentlessly attacking Ms. Vaks. These attacks were not based on Ms. Vaks performance since she delivered results like the Company has not seen in the past, built the cohesive team and was respected by her subordinates and coworkers. His attacks were very personal. While Mr. Quinlan has never specifically told her that she hated her because she was a woman or because she was the oldest one or because she was a Russian Jew, his actions showed that he uncontrollably hated her and used every opportunity to assault her.

30. Several times Ms. Vaks complained to Mr. LeBlanc that Mr. Nagpal and his team retaliate against her and manipulate Mr. Quinlan to attack her. Finally, in September of 2017, Mr. LeBlanc, confirmed to Ms. Vaks that following the reorganization Mr. Nagpal in fact orchestrated a retaliatory campaign against her. Mr. LeBlanc assured Ms. Vaks that he stopped it.

31. However, Mr. LeBlanc did not stop Mr. Quinlan – he continued attacking Ms. Vaks with no reason.

32. On about May 22, 2017, Neal Armstrong, 46 year old, joined the Company as a new QA automation engineer reporting to the QA manager, Susan Fahlbeck, who was Ms. Vaks' direct report. During Ms. Vaks' interview with Mr. Armstrong, he impressed her as a good QA automation engineer but who did not, however, have QA managerial, architectural or manual experience.

33. On July 12, 2017, after Quality Assurance manager, Ms. Fahlbeck (Ms. Vaks' direct report), declined Ms. Vaks' invitation to a meeting to discuss her performance, Ms. Vaks submitted a report to HR describing Ms. Fahlbeck, deteriorating performance, insubordination and steps she should take to improve it.

34. On July 20, 2017, Mr. Quinlan called a meeting with Ms. Vaks. At the meeting he attacked her for writing her subordinate's performance report. He hounded Ms. Vaks that she had no rights in his organization to do that, and he is the only one who has the authority to write such a report. His stance was demining, patronizing, and preserving his hierarchy and a reminder to Ms. Vaks of her proper place in "his organization". Without informing Ms. Vaks, as Ms. Fahlbeck's manager, Mr. Quinlan instructed Ms. Fahlbeck to ignore her and to report directly to him instead. That was a clear example of how Mr.

Quinlan favorably and disparately treated a nonperforming younger employee – the behavior he consistently demonstrated since he became Ms. Vaks' supervisor.  Ms. Fahlbeck was about 44 years old.

35. On August 2, 2017, Mr. Quinlan called another one-on-one meeting with Ms. Vaks. This time he began hammering Ms. Vaks with accusations and threats using Mr. Nagpal's lure: "A lot of people came to me stating that they cannot work with you, and I will not tolerate this in my organization". The dynamic of the meeting was the same as July 20th meeting– blustering, superior and condescending. He yelled and threatened Ms. Vaks with firing. When she asked him to provide some examples, he said that he cannot disclose his sources as he is "investigating her conduct". Ms. Vaks felt that the sole goal of the meeting was to reaffirm his patriarchal power and was triggered by nothing more than his personal enmity against her.

36. Mr. Quinlan did not follow up with his "investigation". However, Mr. LeBlanc did, and he confirmed to Ms. Vaks at their September meeting that "people came to me stating that they cannot work with you" was in fact the theme of the former CEO's retaliation campaign against her.

37. On August 8, 2017, Mr. Quinlan held an all-hands meeting where he announced a reorganization and provided a new org chart. According to his new org chart, Ms. Vaks continued managing the Software Development teams, Mr. Armstrong was promoted to the QA manager and Mr. Byng-Clarke to the manager of Platform & Systems.

38. Importantly, at the meeting one of the engineers asked Mr. Quinlan if there will be any change to the process Health IT had been using - the process Ms. Vaks implemented and managed. He affirmatively stated that there will be no changes to the process Ms. Vaks was responsible for.

39. Mr. Quinlan was a hands off manager who spent most of his time interacting with external customers rather than in Health IT's day-to-day operation. In fact, he only attended a single meeting (Health IT had daily, weekly and by-weekly meetings). Although, Ms. Vaks was responsible for the process and had been running the day-to-day activities working with cross-functional teams, he did not ask her opinion whether Mr. Armstrong is qualified or is a good fit for the position of QA manager. While this position was critical for the Health IT, he made autarchic decision to promote Mr. Armstrong. As Ms. Vaks

learned later, Mr. Quinlan instructed Mr. Armstrong not to collaborate with the Development teams and only communicate with him.

40. It was a different case with Mr. Byng-Clarke. Mr. Quinlan did ask Ms. Vaks and other people's candid opinion about Mr. Byng-Clarke's role and his past performance. After receiving unanimous negative feedback from all employees who had hands on experienced working with Mr. Byng-Clarke and in spite of the fact that Mr. Byng-Clarke was demoted even by the his longtime friend, Mr. Nagpal, Mr. Quinlan promoted him to the role of the manager of Platform & Systems.

41. Mr. Byng-Clarke, 40, and Mr. Armstrong, 45, both younger male managers, quickly figured out that Mr. Quinlan for some reason, whether gender, age or nationality or all together, did not like Ms. Vaks or her role, success and popularity in the Company. Having direct line of communication with Mr. Quinlan they spent their time complaining and conspiring against Ms. Vaks rather than actually producing anything useful for the Company. They correctly calculated that they could score more points with Mr. Quinlan by disparaging Ms. Vaks than actually contributing to the Company's success. Both of them got away with not delivering work, not performing their essential duties, not showing up at work, and violating corporate policies and code of conduct. Neither of them participated in the product development process. Mr. Quinlan clearly favored younger nonperforming employees to Ms. Vaks who successfully managed the Software Development teams and Agile process and produced measurable results for the Company and its clients.

42. Since the quality of the software applications delivered to the company's healthcare clients was critical, and testing was an essential part of the process adopted by the Company, Ms. Vaks offered her help to Mr. Armstrong in understanding of the Team's Process and QA team's role in it. As she learned later, instead of collaborating with the software development teams, he complained about Ms. Vaks to Mr. Quinlan as if she was telling him what to do. Apparently, that infuriated Mr. Quinlan – in his "kingdom" he was the only one who tells people what to do - and that was exactly what Mr. Armstrong wanted to achieve. Mr. Quinlan next belligerent assault against Ms. Vaks followed Mr. Armstrong's complaint: "Who are you to hurt Mr. Armstrong's feelings? I am in charge and I will not lose him (Mr. Armstrong) to you - you will be fired".

7

43. As another example, on about July 27, 2017, Mr. Bing-Clarke complained to Mr. Quinlan that Ms. Vaks conducted the team meeting on how to resume software performance test – poor performance was critical for Health IT applications and could potentially harm the Company's healthcare clients. Mr. Quinlan took the bait and once again attacked Ms. Vaks for taking the initiative even though he had previously approved this meeting.

44. There were other similar examples when Mr. Quinlan intervened and prohibited Ms. Vaks from performing her job responsibilities when she tried to address critical product issues. One of them was related to violation of the data security policies that the Company was legally obligated to provide to its clients' healthcare applications. Ms. Vaks raised this issue with the Development Teams, but Mr. Quinlan intervened and prevented her from even researching this issue.

45. Mr. Quinlan showed a pattern of discrimination when he isolated and limited Ms. Vaks ability to perform her job responsibilities. Some of his actions were influenced and manipulated by his protégés Mr. Mr. Byng-Clarke and Mr. Armstrong whom he treated with respect in spite of their negative contribution to the Company's success.

46. Around the same time, July, 2018, Mr. Quinlan stopped inviting Ms. Vaks to any of the product development related meetings he conducted while inviting other young male managers. He excluded Ms. Vaks from interviewing and hiring process; from any discussions and decisions about her direct reports, their performance and promotions as if she was no longer their manager.

47. Mr. Quinlan could not restrain his animosity and harassing behavior towards Ms. Vaks even in public. His hostile and disparaging conduct was known to the majority of the LumiraDX's employees. One of the examples of this: during one of the meetings he was so enraged and threatening against Ms. Vaks that another employee had to ask the peer to immediately contact Mr. LeBlanc, because the employee was afraid that Mr. Quinlan would fire Ms. Vaks.

48. Despite the fact that the process Ms. Vaks implemented in Health IT was very successful and that several divisions and groups within LumiraDX including Mr. Quinlan's own team, former FitLinxx, asked for her help in implementing their processes, he continued harassing her. It was her success and respect from coworkers that his supremacist ego could not tolerate. At every one-on-one meeting he relentlessly beat Ms. Vaks down until she broke down which he seemingly enjoyed.

8

49. On September 9, 2017, Mr. Quinlan called Ms. Vaks to another one-on-one meeting with no agenda. He immediately confronted her with the statement that "more people had come to him complaining that they cannot work with you", and that he will not tolerate this behavior and is ready to take employment actions against Ms. Vaks. Apparently, that Mr. Armstrong who supposedly threatened to leave the Company because of Ms. Vaks. Since Ms. Vaks had rare communication and never had any conflicts with Mr. Armstrong, she asked Mr. Quinlan to give her examples of why Mr. Armstrong could not work with her, but Mr. Quinlan could not provide any examples. Then Ms. Vaks asked him to invite Mr. Armstrong to his office and explain to her face why he felt this way, but Mr. Quinlan refused. He also prohibited her from talking to Mr. Armstrong. Mr. Quinlan told Ms. Vaks directly that he would not lose Mr. Armstrong and that if somebody were to be fired that it would be her.

50. Following this meeting, Mr. Armstrong, apologized to Ms. Vaks several times for complaining about her to Mr. Quinlan without any reason. He also admitted that having limited communication with her per Mr. Quinlan's instruction, his perception of her was distorted by Mr. Byng-Clarke and Ms. Fahlbeck. Mr. Armstrong ended the meeting by telling her that he never wanted the position of the QA manager, that he had no experience managing a QA group and in particular manual QA, and the only reason he took this position is that he expected to get a pay raise. Mr. Armstrong related their conversation to Mr. Quinlan. However, Mr. Quinlan did not apologize to Ms. Vaks for his unsubstantiated attacks against her.

51. Because Mr. Quinlan's belligerent confrontations became systematic, Ms. Vaks on more than one occasion, complained to Dorian LeBlanc, 43, the new Head of HR and CFO about the pattern of Mr. Quinlan's harassing behavior. He defended Mr. Quinlan and justified his conduct by saying that "he (Tom Quinlan) is under a lot of pressure since he took over Health IT, and Ms. Vaks needs to be compassionate to him". Mr. LeBlanc also rationalized and excused Mr. Quinlan's actions by saying that the Company CEO, Ron Zwanziger, yells at him (Mr. LeBlanc) all the time and he doesn't have any other choice but putting up with it, and so should she – be accepting and tolerant to this type of behavior. Ms. Vaks was stunned by the Head of HR advice and felt completely powerless and defenseless.

52. HR's inaction and failure to intervene and stop the harassment, in effect, condoned Mr. Quinlan's behavior. Since attacks had not stopped, on September 27, 2017, Ms. Vaks scheduled a formal meeting with Mr. LeBlanc. At the meeting, Ms. Vaks presented him a letter/complaint she wrote summarizing the harassment and hostility she was experiencing at the workplace. Once again he defended Mr. Quinlan's, Mr. Byng-Clarke's and Mr. Armstrong's attacks against her and encouraged her to be patient with them. According to Mr. LeBlanc it was Ms. Vaks who was supposed to change her behavior by pleasing her abusers. Delivering the product, managing people and processes, being professional and respectful to coworkers and by coworkers was not what the Company expected from Ms. Vaks. Rather tolerance to harassment was the prerequisite to continue her employment with LumiraDX.

53. Having Mr. Quinlan's blessing not to collaborate with the Development team, Mr. Armstrong instructed the QA team to stop testing the upcoming release and to stop participating in the product related meetings. In absence of QA team, Ms. Vaks asked the Development team to take on additional responsibility in testing the most critical to the Company release.

54. Subsequently, in October 2017, the Development team delivered the best release in the Company's history. Following the release, on October 23, hoping that their success would change the pattern of Mr. Quinlan's hostile behavior, Ms. Vaks approached him expecting to discuss some of the issues the Team experienced during the development phase and what improvements they can make going forward. Instead of praising the Development teams for its hard and diligent work, Mr. Quinlan immediately confronted her and spent the entire meeting blaming the female API manager for not supporting Mr. Armstrong who did not participate in the release. He used strong words like he "would get her fired because her team did not answer Mr. Armstrong's question". Then he turned his rage against Ms. Vaks for supposed mismanaging the development teams when she failed to instruct everybody to stop working on product release and immediately answer any of Mr. Armstrong's questions. Ms. Vaks' explanation that the development teams were busy working on the critical software release and that they had already established process to address these type of issues fell on deaf ears. He continued yelling and threatening her with firing. This time he said that the "legal department" were investigating her and the

female API's manager professional misconduct. As before, there was no follow up of his "investigation".

55. Having responsibility for the quality of the software product to their Health Care clients and not being able to discuss any product development issues with her boss, on October 27, 2018, Ms. Vaks sent email to the management team raising her concerns about the quality of the product delivered to the clients and jeopardy to consequent releases. [1]

56. Mr. Quinlan's reaction to Ms. Vaks' email was predictable – nobody could criticize his young protégée, Mr. Armstrong, even when the Company's product quality is in jeopardy. Mr. Quinlan condescendingly replied to her: *"This is completely inaccurate and inappropriate. Please be in my office at 8am Monday morning to discuss*."

57. The October 30, 2017, meeting was the culmination of Mr. Quinlan's harassing behavior. He started the meeting by lying to Ms. Vaks that her email violated Code of Conduct and that "the Company's legal department is investigating her conduct and tasked him to interrogate her". He backed off after she said that she would not participate in legal conversation without her attorney. The theme of the meeting was the same - "I am in charge here. You have no right to criticize Mr. Armstrong. He is right and you are wrong and you will be punished by termination." As always, he was aggressive, disrespectful, demeaning and threatening.

58. Following this meeting, on October 31, 2017, Ms. Vaks sent a text message to Mr. LeBlanc stating: ***"I can no longer tolerate the aggressive and abusive behavior of Tom Quinlan who for months has been harassing me. I am prepared to file a formal complaint with the Company and MCAD/EEOC"***.

59. Mr. LeBlanc scheduled a meeting with Ms. Vaks on November 1, 2017 to discuss her complaint. The Company legal counsel, Veronique Ameye, joined the meeting via phone. Ms. Vaks described in detail what happened before and during the meeting with Mr. Quinlan and asked Mr. LeBlanc to intervene and stop the ongoing harassment and hostile environment. She also said that the Company's Code of Conduct required her to raise all

---

[1] The Company's code states: ***"****Our core is to deliver high quality and safe products and services. We aim to provide products and services that are accurate, reliable, timely and safe. Customer trust is key. Our reputation rests on the quality of our products and services. We furthermore aim to respond quickly and promptly to any legitimate concerns or complaints raised and employees should speak up when any quality issues are identified.... LumiraDx employees are expected to immediately report adverse events relating to LumiraDx products to the local regulatory and quality function."*

and any issues related to the Quality of the product it delivers to its clients and that the Code prohibits retaliation against her for raising quality related issues. The meeting ended with no promises to investigate her complaint or to stop the harassment.

60. Ms. Vaks had not heard back from Mr. LeBlanc or anybody else about her complaint or the investigation.

61. On November 3, 2017, Mr. Quinlan sent Ms. Vaks an invitation to a meeting to review the QA process he was proposing. Ms. Vaks had to decline the invitation since she had an appointment with her mom's hospice nurse (See ¶ 68). He called her out for taking paid time off (PTO) without his approval. While Ms. Vaks' appointment was unforeseeable and, therefore, PTO was allowed by the Company's policy, Mr. Armstrong and his team members rarely showed up at work without getting approvals or even marking the Company's calendar in violation of the Company's policy. Time after time Mr. Quinlan had showed preferential treatment to younger male employees.

62. On December 12, 2017, Mr. Quinlan called the management meeting where he announced that a new VP of engineering, Todd Storch, will be starting the very next day, December 13. He also announced the reorg under which Ms. Vaks ranking in the Company hierarchy went down.

63. Prior to hiring Mr. Storch, LumiraDX did not post the job opening either internally or externally. His hiring was kept in secret.

64. At all times during her employment, Ms. Vaks was fully qualified and accomplished at both of her positions as the Engineering Lead and Agile Process Manager and performed her job duties well in spite of Mr. Quinlan's deliberate obstructionism. Nevertheless, she was not given an opportunity to apply and to be considered for the promotion. Notably, Mr. Storch is about 13 years younger than Ms. Vaks.

65. Mr. Storch received compensation higher than Ms. Vaks. Furthermore. It's believed that Mr. Storch received stock options as part of his compensation while Ms. Vaks was promised by both Mr. Nagpal and Mr. LeBlanc, but had never received any stock options.

66. On December 13, 2017, Mr. Storch, 48, started his employment with LumiraDX and took over Ms. Vaks' job functions leading Engineering Department.

67. On December 14, 2017, Ms. Vaks had a meeting with Mr. LeBlanc where she expressed her concerns about the hiring process and her demotion. Since before Ms. Vaks was hired she was interviewed by eight different people, she expected to interview or at least have a

chance to speak to the person to whom she would be reporting. She also raised her concerns that Mr. Storch's job responsibilities significantly overlap with hers, and it looks like he was hired to replace her. Because Mr. LeBlanc did not reply, Ms. Vaks asked him directly if this is true. He replied – "Maybe". Then Ms. Vaks told him that she considers hiring Mr. Storch and consequently her demotion to be a retaliation for her harassment complaint against Mr. Quinlan. At the end of the meeting, since she did not hear from anybody about the status of her harassment complaint against Mr. Quinlan, Ms. Vaks asked Mr. Leblanc how her complaint was resolved or going to be resolved. Mr. LeBlanc replied "that hiring of Mr. Storch was exactly how the Company resolved her harassment complaint". At the time of the meeting Ms. Vaks' termination process was already in progress.

68. LumiraDX started Ms. Vaks' termination process immediately after her November 1, 2017 meeting with Mr. LeBlanc where she discussed her harassment and discrimination complaint and consequently replaced her Engineering managing position with younger higher compensated Mr. Storch.

69. On October 13, 2017, Ms. Vaks' mother was diagnosed with stage four liver cancer. On October 16 & 17, she informed Mr. Quinlan and Mr. LeBlanc about her family situation and told them that she would need to take some time off to provide care for her terminally ill mother. At no point did they inform or provided legally required notice to Ms. Vaks about her eligibility to take leave under FMLA in violation of FMLA regulations. Her mother passed away on December 21, 2017.

70. On January 4, 2018, Mr. LeBlanc called Ms. Vaks to inform her that she has been terminated. She asked him for a reason for termination. He replied that "we have different directions". That was the *only* explanation given to her as the reason for her termination.

71. LumiraDX's January 4, 2018 termination was qualified as a "Group Layoff".

72. After terminating Ms. Vaks, LumiraDX began looking for her replacement as Agile Transformation Manager - the job responsibility she was hired to perform.

73. On January 8, 2018, Ms. Vaks requested that Mr. LeBlanc provided her with a copy of her personnel record which she untimely received on January 17, 2018. Her record contained eight negative records that she had not seen before. At the same time, there were no records of her promotion, job responsibilities, changes in her job responsibilities and no

termination notice - mandatory items that the Company was required to maintain by law for each employee's personnel record.

74. Ms. Vaks has personal knowledge of at least one more discrimination and retaliation case committed by LumiraDX that happened in May of 2017 to another female employee who filed a complaint with HR about harassment and hostility she was experienced by another employee. In that case, Ms. Vaks who was responsible for quality assurance (QA) specifically requested Hemant Chowdhry, at that time Director of HR, not to terminate her, because of insufficient QA resources for testing of the upcoming release. She was terminated a couple of weeks after she filed her complaint and because she filed it.

75. On January 4, 2018, LumiraDx provided Ms. Vaks with the Separation Agreement which she signed on January 28, 2018. The employment Separation Agreement intended to release the Company from "Claims arising under the Federal Age Discrimination" along with other state and federal claims. However, the agreement substantially violated most of OWBPA requirements.[2]

76. The agreement was confusing, ambiguous, misleading and contained contradictory language. For example: the language of the release firstly provided unwaivable rights to file charges with Government agencies which immediately followed that the Company retain the right to dismiss those charges. It included an unlawful provision challenging Ms. Vaks rights to file a discrimination charge with Government agencies. At the time she signed the Separation Agreement she understood that Defendants threatened her to reclaim the severance payment if Ms. Vaks decides to challenge the validity of the invalid in this case Release. Ms. Vaks has never consulted an attorney, and it took her a year to understand all legal ramifications of the convoluted language of the Agreement.

77. Tom Quinlan, LumiraDX's General Manager and Ms. Vaks' supervisor, for months discriminated, harassed and created intolerable by any human being hostile workplace environment. Dorian LeBlanc, Head of HR and current CFO, knew about his behavior and did nothing to stop it. Mr. LeBlanc failed to investigate Ms. Vaks harassment complaints. Instead, he defended and condoned Mr. Quinlan's behavior. When Ms. Vaks decided to

---

[2] a) The waiver must be understandable; b) The employee must have 45 days to consider the offer; c) The employer must allow a seven-day revocation period; d) The waiver did not comply with additional requirements for "Group Layoffs"; e) The waiver did not provide additional consideration for waiving ADEA claims.

stop the ongoing harassment and complained about it to Human Resources, LumiraDX by its executives and agents, Tom Quinlan and Dorian LeBlanc, fired her.

78. Ms. Vaks believes that LumiraDX is engaged in systematic and egregious violations of _numerous_ employment laws.

## COUNT I

### Age Discrimination in violation of Employment Act (ADEA) 29 U.S.C. § 621 and M.G.L. c. 151B, §§ 1, 4 et seq.

79. The foregoing paragraphs are re-alleged and incorporated by reference herein.

80. Ms. Vaks' age is a classification protected under § 12(a) of the ADEA, 29 U.S.C. § 631(a).

81. Defendants treated Ms. Vaks less favorably than younger, similarly situated employees.

82. Defendants terminated Ms. Vaks because of her age.

83. Ms. Vaks was replaced by younger male person.

84. After terminating Ms. Vaks, Defendants were looking for a replacement for her second job responsibility as Agile Transformation Manager.

85. Defendants had actual or constructive knowledge of ongoing discrimination and harassment.

86. Defendants failed to take appropriate remedial actions to prevent or correct further discrimination and harassment of Ms. Vaks.

87. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT II

### Retaliation pursuant to the ADEA 29 U.S.C. § 623(d)

88. The foregoing paragraphs are re-alleged and incorporated by reference herein.

89. Ms. Vaks was subject to adverse actions such as termination in retaliation by Defendants when she exercised her rights complaining about the ongoing harassment, discrimination and hostile environment.

90. The retaliation endured by Ms. Vaks would dissuade a reasonable employee from making complaints of discrimination and harassment.

91. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT III

### Violation of OWBPA 29 U.S.C. § 626(f) and ADEA itself arising out of Defendants obtaining waivers of ADEA and OWBPA claims from Ms. Vaks

92. The foregoing paragraphs are re-alleged and incorporated by reference herein.

93. Defendants implemented the unlawful waivers of OWBPA and ADEA statutes which are against public policies.

94. Defendants implemented the unlawful waivers that include tender back provision which intended to interfere with Ms. Vaks' legal rights to file an ADEA complaint, which had a "chilling effect" on Ms. Vaks' ability to file age discrimination claims.

95. Defendants implemented the waivers with the intent that this chilling effect occur.

96. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

97. As remedy, Ms. Vaks seeks that she be notified that the entire Separation agreement is void.

## COUNT IV

### Violation of public policy arising out of Defendants' interference with Ms. Vaks right to participate in government agencies employment discrimination proceedings

98. The foregoing paragraphs are re-alleged and incorporated by reference herein.

99. Defendants implemented the waivers that include tender back provision which intended to interfere with Ms. Vaks' right to participate in a proceeding with any appropriate federal, state or local governmental agency enforcing discrimination laws.

100.   Defendants intended to deprive Ms. Vaks with access to the legal process and to mislead her regarding her legal rights to file charges or complaint of discrimination against Defendants.

101.   Defendants implemented the waivers with the intent that the chilling effect occur.

102.   Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

103.   As remedy, Ms. Vaks seeks for the declaration that the entire Separation agreement or alternatively Provision #6 was declared invalid.

## COUNT V

**Severance agreement is invalid since Ms. Vaks' consent have not been given voluntarily and knowingly in violation of OWBPA, ADEA, Title VII and MGL C. 151B**

104. The foregoing paragraphs are re-alleged and incorporated by reference herein.

105. Defendants was required by the OWBPA, ADEA, Title VII and MGL C. 151B, but did not comply with requirements of "**voluntarily and knowingly**".

106. Defendants' Agreement was materially misleading, misinforming and misrepresenting with the intent to fraudulently obtain Ms. Vaks' consent.

107. Defendants' non-compliance intended to deprive Ms. Vaks with access to the legal process and to mislead her regarding her legal rights to file charges or complaint of discrimination against Defendants.

108. As remedy, Ms. Vaks seeks for the declaration that the entire Separation agreement or alternatively Provision #6 was declared invalid.

## COUNT VI

### National Origin Discrimination
### In Violation of Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B, §§ 1, 4 et seq

109. The foregoing paragraphs are re-alleged and incorporated by reference herein.

110. Ms. Vaks, as a Russian Jewish woman, is a member of a protected class based on national origin.

111. Ms. Vaks was terminated because of her national origin.

112. As a result of Defendants' conduct, Ms. Vaks has suffered damages including economic losses and emotional distress, in an amount to be determined at trial.

113. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT VII

### Gender Discrimination
### In Violation of Title VII of the Civil Rights Act of 1964 and 1991 and
### M.G.L. c. 151B, §§ 1, 4 et seq

114. The foregoing paragraphs are re-alleged and incorporated by reference herein.

115. Ms. Vaks is a female and is a member of protected class.

116. Defendants have discriminated Ms. Vaks and subjected her to disparate treatment because of her gender, which has been severe, pervasive and offensive.

117. Defendants had actual or constructive knowledge of ongoing discrimination and harassment.

118. Defendants failed to take appropriate remedial actions to prevent or correct further discrimination and harassment of Ms. Vaks.

119. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT VIII
### Retaliation under Title VII, 42 U.S.C. 2000e-2(a), *et seq*  and
### M.G.L. c. 151B §§ 4(4) & 4(4A)

120. The foregoing paragraphs are re-alleged and incorporated by reference herein.

121. Ms. Vaks was subject to adverse actions such as termination in retaliation by Defendants when she exercised her rights complaining about the ongoing harassment, discrimination and hostile environment.

122. The retaliation endured by Ms. Vaks would dissuade a reasonable employee from making complaints of discrimination and harassment.

123. The retaliation endured by Ms. Vaks would dissuade a reasonable employee from making complaints of discrimination and harassment.

124. Defendants knew that their actions were illegal.

125. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT IX
### Hostile Environment in Violation of ADEA, Title VII and
### M.G.L. c. 151B, §§ 1, 4 et seq.

126. The foregoing paragraphs are re-alleged and incorporated by reference herein.

127. Defendants have created hostile work environment and subjected the Ms. Vaks to disparate treatment because of her gender, age and national origin which has been severe, pervasive and offensive.

128. Defendants had actual or constructive knowledge of ongoing hostility and harassment.

129. Defendants failed to take appropriate remedial actions to prevent or correct further hostility and harassment of Ms. Vaks.

130. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT X
### Aiding and Abetting in violation of 151B, section 4(5)

131. Ms. Vaks hereby incorporates all allegations in this document with the same force and effect as if set forth herein.

132. Defendants had the authority or duty to act as the employer.

133. Defendants intended and deliberately discriminated Ms. Vaks in a manner that was in disregard of her legal rights.

134. Defendants intentionally aided, abated and assisted such discrimination forbidden by the statute.

135. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Ms. Vaks and in conscious disregard of Ms. Vaks' rights.

## COUNT XI

### Interference with Ms. Vaks' rights in violation of the FMLA 29 U.S.C. § 2615(a)(1). Illegal obtaining a release of FMLA claim in violation of 29 C.F.R. § 825.220(d)

136. Ms. Vaks incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

137. Defendants interfered with Ms. Vaks' rights under the FMLA by failing to inform and notify her of her FMLA rights when she first became eligible and began needing time off under 29 C.F.R. § 825.303(a)-(b)

138. Defendant knowingly, intentionally, and willfully failed to provide Ms. Vaks with the leave to which she was entitled.

139. As a result of Defendants interference, Ms. Vaks suffered damages, including but not limited to emotional distress, humiliation and embarrassment.

## COUNT III (Proposed Second Amended Complaint)

**Invalidity of the Release arising out of Unconscionability and
Violation of public policies at the time it was made**

140.   The foregoing paragraphs are re-alleged and incorporated by reference herein.

141.   Defendants knowingly implemented the waivers that includes provision that interferes with Ms. Vaks' right to participate in a proceeding with any appropriate federal, state or local governmental agency enforcing discrimination laws and/or to challenge the validity of the statutory incompliant Release.

142.   Defendants intended to deprive Ms. Vaks with access to the legal process and to mislead her regarding her legal rights to file discrimination charges against Defendants with government agencies and/or to challenge the validity of the statutory incompliant Release.

143.   Defendants implemented the Release with the intent that the chilling effect occurs.

144.   As remedy, Ms. Vaks seeks for the declaration that the Release was declared invalid and unenforceable.


**WHEREFORE**, the Plaintiff, Rimma Vaks, respectfully requests that this Court grant the following   relief:

1. Compensatory, exemplary, punitive and liquidated damages in whatever amount she is found to be entitled;
2. A judgment to make Ms. Vaks whole by providing her appropriate lost earnings and benefits, and other affirmative relief.
3. An award of interest, costs and reasonable attorney fees, and,
4. Grant such other relief as this Court deems just and proper.

Dated: 28 May, 2019

Respectfully submitted,
Rimma Vaks
/s/ Rimma Vaks, *Pro Se*,
103 Puritan Lane,
Swampscott, MA 01907
Rimma.Vaks@verizon.net
781-581-6994

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, May 28, 2019, I electronically filed this Document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Gauri P. Punjabi, Jennifer Budoff
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
GPPunjabi@mintz.com
JRBudoff@mintz.com
Attorney for Defendants