Deposition of Dorian LeBlanc under Rule 30(b)(6) (##517-692)

Q.  Now we have questions about hiring of Mr. Storch. When did you start looking for person to fill the position of VP of engineering?

A.  In the fall of 2017.

Q.  Can you be more explicit please? What month?

A.  To my best recollection, it would be September.

Q.  So, I just want to remind you that this is on the record. Did you advertise this position?

A.  We did not advertise the position.

Q.  Did plaintiff know about this opening?

A.  Can't speak to what the plaintiff knew. I didn't ever, I did not inform the plaintiff that we were recruiting at this position.

Q.  Let me rephrase it. Did you tell plaintiff about this opening?

A.  No.

Q.  Who knew about this opening?

A.  Tom Quinlan and myself. And the recruiter that was hired to recruit for the position.

Q.  Do you have any hiring policies in the company?

A.  We have no written policies around hiring.

Q.  Who interviewed Mr. Storch?

A   I am certain, that both Tom Quinlan and I interviewed Mr. Storch. I don't recall if there was anyone else involved in the interviews.

Q.  Did you interview any other candidates?

A.  Yes, we did.

Q.  How many?

A.  I don't have a recollection of how many, we were interviewing for multiple positions simultaneously across the organization that I was involved in.

Q.  Was product management supposed to report to VP of engineering?

A.   Product management?

Q.   Product management.

A.   I don't recall the scope of that at that time.

Q.   This is hiring this subject, the topic was listed in notice and it's allowed by the court to question.

MS. PUNJABI:   Yeah. Mr. Todd's hiring that's fine.

Q.   Yeah. But your witness doesn't have an answer.

MS. PUNJABI:   Ask the question again please.

Q.   Yeah. Was product management supposed to report to VP of engineering?

A.   I don't recall the product manager.

MS. PUNJABI:   He says he doesn't recall.

A.   Paul Olore joined the organization in product management at some point around that same time, we had many conversations about the structure of the organization internally. I don't remember what the reporting lines were going to be drawn to be.

Q.   Did you prepare to this deposition?

A.   I reviewed the materials that have been shared with you per your request as the plaintiff.

Q.   So, you didn't find any information about this?

A.   There's 500 or 600 pages of documentation. I can't sit here and recall every word that's within that documentation. To the best of my knowledge, I do not remember if product management as a function was intended to report to this role. And if so, at what point in time, whether it was that at hiring or during future conversations around the structure of the organization.

Q.   Was DevOps supposed to report to VP of engineer?

A.   I'm sorry, I, I don't recall at that time the structure that we had planned.

Q.   Was architecture supposed to report to VP of engineering?

A.   I'm unable to recall the specific functions, but concept of hiring this individual and in its totality was to remove Tom Quinlan from the day-to-day operations of managing software development in the Waltham office so that he could

participate in several other programs that company had going. He had assumed that role to manage day-to-day operations while we still had Sumit Nagpal as part of the organization. When Sumit left Tom's role within the software business related to delivering software products to clients expanded. He also had a role in developing our diagnostic product. So, the concept of the role, well I don't remember the specific reporting departments, was to replace Tom Quinlan as managing the day-to-day operations. So, any and all of these roles may have been intended to report, but I cannot remember specifically which ones as software development isn't one of my areas of expertise, it's hard for me to remember that all these lines.

Q.   We have a problem here.

MS. PUNJABI:   I don't think so but continue.

Q.   Was there a cap on his compensation?

A.   I'm sorry, could you repeat the question?

Q.   Was there a cap on this position compensation salary.

A.   Was there a cap on the salary?

Q.   Yeah.

A.   I don't think there was a cap on the compensation. I think we try to set compensation that's market driven based on the role.

Q.   Okay. So, there was no cap?

A.   I'm confused by the question. I'm not sure who would impose a cap.

Q.   Typical when company hire, they have some idea how much they want to pay to a person. So that's the question. Did you have any idea about salary compensation that you willing to pay for this position?

A.   We discussed the market range of compensation for that type of role with the recruiting firm that we utilized to search for the position after we described the job responsibilities that we expected the person to hold.

Q.   So, was there a cap? Did you have a cap on this position or salary range for this position?

A.   Well, I think there would naturally be a cap. I don't think we were going to pay the person $15 million per year. I think we were looking to pay a market-based compensation.

Q.   Okay. Who compile job description for this position?

A.   Tom Quinlan.

Q.   So, you said, you stated that you started your process of looking for VP of engineering in September of 2017. Is that correct?

A.   I stated that we start that process in the fall and you asked me to be more specific and I stated to the best of my recollection that may have been September.

Q.   Okay. And when did you give him an offer?

A.   I believe he started in December. So, I would expect that we have given him an offer in early November given the timing. But I don't recall the exact date.

Q.   Do you have any records of that?

A.   Yes, we would have a job offer letter that would be in his personnel file. And I believe that we've provided to you as per your document request.

Q.   No, you didn't.

MS. PUNJABI:   Yes, we did Ms. Vaks.

MS. VAKS: Offer letter? He did not. You failed to provide me offer letter.

MS. PUNJABI:   Oh, I take that back, you're correct. The judge decided that we did not have to provide you with the offer letter itself just the offer day.

MS. VAKS: That's why I'm asking question.

MS. PUNJABI:   No, that's why I'm allowing it, go ahead.

A.   I provided the offer letter to our counsel I should say. I have not provided any documents directly to you.

Q.   And that offer letter stated that his compensation and what was his compensation?

MS. PUNJABI:   Ms. Vaks as you know, the judge had ordered that we did, that we did not have to provide that information to you just the start, just the start date so. COACHING

MS. VAKS: That wasn't objection.

MS. PUNJABI:   But it's, you're going outside the scope of the topics.

MS. VAKS: This is hiring Todd Storch.

MS. PUNJABI:   Ms. Vaks, we already have a court order and the court already ruled on this information.

MS. VAKS: No, you don't have it. I'm sorry, but you don't have a court order. You have court order that allows questioning regarding Todd Storch hiring. That's the core of it. I have a copy.

MS. PUNJABI:   No, I have it in front of me to that the decision to hire Mr. Storch, you'd asked for information regarding his compensation previously and the court said we did not have to.

Ms. VAKS:  That doesn't apply to this hearing.

MS. PUNJABI:   This this is all the same case.

MS. VAKS: No.

MS. PUNJABI:   It is all the same case. It's all part of the discovery. If you'd like, we can, we can pause on that question and continue and then come back to it. Just look at the court orders.

MS. VAKS: We have the court orders that deponent is supposed to answer questions regarding Todd Storch hiring and this is the question regarding Todd Storch hiring. There's nothing else. Anything according to rules, all previous objections does not count.

MS. PUNJABI:   Ms. Vaks, I'm not, I'm telling you what, we have court decisions on this issue. If you'd like to continue the deposition, please go ahead.

MS. VAKS: Yes, I would like to, you can—

MS. PUNJABI:   I'm instructing him not to respond at this particular issue. After the break, we can reconsider it and come back to it. But that's for now if you'd like to move on, please move on.

Q.   Okay. I would like to repeat my question. And so do you confirm that your counsel prohibited your to answer the question about salary or compensation of Todd Storch?

Ms. PUNJABI:   I'm instructing you not to answer on regarding his compensation for the moment.

A.   I confirm.